*128 OPINION OF THE COURT
W. Dennis Duggan, J.
The question to be decided in this case is whether Harriet Webster, the nearly life-long foster mother of Alex Ryan, Jr. (June 2, 1995), has standing to make a claim for visitation rights against Alex’s biological father. The court finds that she does not.[2]
Alex, Jr. was born with a positive toxicology for cocaine. As a result of this, he was removed from his mother’s custody shortly after birth. Her parental rights were eventually terminated upon a finding of abandonment. The father’s parental rights were terminated in 1999, based on permanent neglect. The Appellate Division reversed the termination decision (Matter of Alex LL. v Albany County Dept. of Social Servs., 270 AD2d 523). The Court, in finding that the record contained ample evidence that the father should not have had his parental rights terminated, held that the father’s attempts to establish a relationship with his son were short circuited by an unresponsive Department of Social Services (DSS) and a dismissive Family Court. Going even further, the Court found that the evidence supported a finding that the father should have been given custody of his son. Because of the extended period of time between the hearing and the appellate court’s decision, the Appellate Division remanded the case to Family Court for an expedited hearing on parental fitness.[3] The Court also directed that all future proceedings be held before a differ *129 ent Judge. Upon remand, custody of the child was granted to the father with the consent of DSS and the Law Guardian. The court retained jurisdiction of the case to facilitate the transition of the child from his foster home to that of the father. As a result, the court entered a series of visitation orders which gradually decreased the time the child spent with the foster mother and increased the time spent with the father. At this point in time, the father has full custody and the foster mother has weekly Sunday visits. The foster mother now seeks to maintain that time and the father wishes to terminate court-ordered contact between the foster mother and the child. *130 Third, the foster mother is seeking guardianship of the child pursuant to Family Court Act § 661. Fourth, she claims a right to visitation based on an expansive reading of Bennett v Jeffreys and its progeny (40 NY2d 543, supra). Finally, she claims that a constitutionally protected due process liberty interest supports her claim. For the reasons that follow, the court finds that none of the above theories provide a basis for the relief requested by the foster mother.
*129 The foster mother approaches the court from several legal directions. First, she seeks to have the consent custody order vacated on the grounds that Social Services Law § 383 (3) gave her the right to intervene in those proceedings. She claims that she was not afforded this right. Second, she argues that CPLR 1012 gives her authority to intervene as a party in interest.
*130 CPLR 1012 provides for intervention as of right in a lawsuit when a statute confers such a right or “[w]hen the representation of the person’s interest by the parties is or may be inadequate and the person is or may be bound by the judgment.” (CPLR 1012 [a] [2].) This section does not assist the foster mother. If a statute confers a right of intervention then it does so by its own authority and the first paragraph of section 1012 (a) just states the obvious. The “inadequate representation” situation arises most often in class action situations where a court must determine if the class of plaintiffs to be certified can properly represent a disparate group of aggrieved individual litigants. However, in this case, without a more clearly and legislatively defined foster parent interest in this “fitness hearing” (the Appellate Division’s choice of words), the foster mother will not be bound by the court’s judgment in the usual sense of what it means to be bound by a judgment. The foster mother certainly has a natural and understandable interest in these proceedings and will, in a general sense, be bound by the results of the litigation. However, section 1012 gives the foster mother no independent right to intervene.
The foster mother next claims that Social Services Law § 383 (3) gives her the right to intervene in these proceedings. Social Services Law § 383 (3) provides as follows:
“Foster parents having had continuous care of a child, for more than twelve months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding involving the custody of the child. Such intervention may be made anonymously or in the true name of said foster parents.” (Emphasis added.)
One must first ask if this fitness hearing involves the type of custody proceeding intended by this law. Also, if it does permit intervention in this type of case, what steps, if any, must the court take to facilitate the exercise of this right? Is the giving of notice of the proceedings sufficient or must the court arraign *131 the foster mother and advise her of her rights? Answering the second question first, the court notes that the foster mother was present in court for all five of the court proceedings after the remand from the Appellate Division. Not until the fifth court appearance, coming 10 weeks after the order of custody which returned the boy from DSS care to his father, did the foster mother file a motion to intervene. If a right to intervene does exist, the court finds that her motion was untimely pursuant to CPLR 1012 (a). Additionally, the court declines to en-graft onto the statute some affirmative requirement by the court to advise a potential intervener of his or her rights and obtain a waiver before proceeding.
More importantly, and irrespective of the timeliness issue, the court finds that this fitness proceeding is not encompassed within the meaning of the custody proceeding covered by Social Services Law § 383 (3). Admittedly, the context of this statute is of little help in determining its exact meaning, floating as it does in the middle of a section which covers a broad area of children in DSS placement or awaiting adoption. For example, a literal reading of the statute would permit a foster parent to intervene in a custody proceeding between two parents long after a child has been returned to one or both of the parent’s custody, so long as the foster parent had custody of the child for some continuous 12-month period at some point in time. The courts have held that, in such a case, the foster parent is really a former foster parent and does not come within the meaning of the statute. This is obviously a correct result but not because statutory construction supports it. The Legislature, in using the construction “having had continuous care” as opposed to just “having continuous care,” leaves the statute open to such a tortured and clearly unintended interpretation.[4] However, the courts that have looked at this law have generally applied it to the dispositional phase of termination or neglect proceedings. Custody, in that context, involves an examination of the “best interest of the child” where the court is required to balance competing choices of what would be the *132 best custodial placement of the child, continued foster care or return to the parent. In fact-finding proceedings, the court has not yet reached the best interest question and, accordingly, the right to intervene by a foster parent does not yet come into play. (See Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196; Matter of Mavis M., 110 Misc 2d 297; State of New York ex rel. Wallace v Lhotan, 51 AD2d 252.) On this remand from the Appellate Division for a “fitness determination,” the court was engaged in a fact-finding determination, not a best interest custody balancing determination. Social Services Law § 383 (1) provides that: “The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except * * * in pursuance of an order of a court * * * determining that the interest of the child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support and educate such child.” The fitness hearing conducted on this remand is similar to the type of proceeding governed by the language quoted above, but not exactly so. The Appellate Division has ruled that the father should have been given custody of his child. At this time, the Family Court’s function is to determine only if any intervening circumstances contraindicate this result. Accordingly, the foster mother has no standing in this proceeding to challenge the father’s custodial claim. That being the case, it clearly follows that Social Services Law § 383 (3) offers no avenue for the foster mother to seek visitation (Matter of Rivers v Womack, 178 AD2d 532).[5]
*133 The foster mother has also applied for guardianship of the boy. SCPA 1702 provides that “[w]here an infant has no guardian the court may appoint a guardian of his person or property, or of both.” On its face, a guardianship petition in this case would not lie because the boy does have a guardian, his father. However, the courts have engrafted onto this statute the Bennett v Jeffreys test (Bennett v Jeffreys, 40 NY2d 543, supra). This is used to resolve custody cases between a parent and a nonparent. To make out a case under this test the foster mother would have to show that the father was unfit, or that he surrendered, abandoned or persistently neglected the child. None of these claims has been raised, nor could they be proven on the extensive record already available to the court in this case. A final category of the Bennett v Jeffreys test is that of “extraordinary circumstances.” In this case, the only extraordinary circumstance, the existence of which is not in dispute, is that the child lived with the foster mother from near birth to about age five. Even if the court found this to be an extraordinary circumstance, it still could not grant guardianship of the child to the foster mother. The matter before the court is the issue of parental fitness of the father to have his child returned to him. It is not a contest between the father and the foster mother as to who is the better parent. If that were the test, in most cases involving foster care placements arising out of neglect proceedings, the parent would never have his child returned to him. After all, foster parents are trained and certified by the State and are presumed to have superior parenting skills. In this case, the foster mother’s real wish is to have Bennett v Jeffreys applied to a visitation claim. The Court of Appeals has already answered this question in the negative (Matter of Ronald FF. v Cindy GG., 70 NY2d 141).[6] The court finds that a petition for guardianship does not offer the foster mother any avenue for relief.
*134 Lastly, the foster mother claims that she has a liberty interest under the Fourteenth Amendment to the United States Constitution to seek visitation with her former foster child. The court here adopts the reasoning set forth in Rodriguez v McLoughlin (214 F3d 328 [2d Cir 2000]) and denies the foster mother’s claim on this ground. In Rodriguez, DSS did an emergency removal of the child from the care of the foster mother. It based the removal on inadequate guardianship. The child had been in the foster mother’s care for about four years. The “fair hearing” pursuant to 18 NYCRR 443.5 (c) to review the circumstances of the removal was not held until more than three months after the removal. The child was eventually returned to the foster mother, who adopted the child. The foster mother claimed that her liberty interest in maintaining the integrity of her family required that she be given an opportunity to be heard at a meaningful time, not more than three months after the removal. In short, she argued that she was denied due process because the hearing was not held quickly enough after the removal. The Court of Appeals held that the foster mother had no cognizable liberty interest to which any due process rights attached. The Court noted that a liberty interest can arise from two sources. One is the Due Process Clause itself and the second is from State law. Recognizing that the Due Process Clause is the source of many interfamilial rights, the court declined to extend this to the foster family. “ ‘[H] owe ver, whatever emotional ties may develop between foster parent and foster child, have their origins in an *135 arrangement in which the State has been a partner from the outset * * * where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties’ ” (Rodriguez, supra, at 337, quoting Smith v Organization of Foster Families for Equality & Reform, 431 US 816, 845-846). For the liberty interest sought by the foster mother in this case to be found in State law, Rodriguez (at 338) held that “a statute or regulation must ‘contain explicitly mandatory language, i.e., specific directives to the decisionmaker that if the regulations’ substantive predicates are present, a particular outcome must follow’ ” (Rodriguez, supra, at 338 [internal quotations omitted], quoting Kentucky Dept, of Corrections v Thompson, 490 US 454, 463). In analyzing New York State’s statutory scheme relating to the rights of foster parents the court held: “We see in these sections no language providing substantive predicates for, or substantive limitations on, the exercise of official discretion with respect to matters of removal or visitation” (Rodriguez, supra, at 340). Likewise, in this case, there are no statutory provisions that create a liberty interest in the foster mother which would support her claim to visitation rights to a child who was once in her care but has been returned to a biological parent. Accordingly, the foster mother’s request for relief on constitutional grounds is denied.
The Legislature of the State of New York has given the courts a nearly bare canvass upon which to sketch the law of child custody and visitation. For example, article 6, title 1 of the Social Services Law, “Care and Protection of Children,” provides in section 371 (11) that “ ‘Custody’ ” means custody in pursuance of or in compliance with expressed provisions of law. In article 7 of the Domestic Relations Law, governing adoptions, section 109 (6) provides that “ ‘Lawful custody’ shall mean a custody (a) specifically authorized by statute or (b) pursuant to judgment, decree or order of a court or (c) otherwise authorized by law.” Domestic Relations Law article 5-A, the Uniform Child Custody Jurisdiction Act, provides in section 75-c (2) that a “ ‘Custody determination’ means a court decision and court orders and instructions providing for the temporary or permanent custody of a child, including visitation rights.” Domestic Relations Law § 240 (1) (a) provides that in marital actions or custodial proceedings the court “shall enter orders for custody and support as, in the court’s discretion, justice requires, having regard to the circumstances of the case and *136 of the respective parties and to the best interests of the child * * * In all cases there shall be no prima facie right to the custody of the child in either parent.” Domestic Relations Law § 70, “Habeas corpus for child detained by parent,” in addition to containing the best interest language of Domestic Relations Law § 240, also contains the direction that the court shall determine what “will best promote [the child’s] welfare and happiness” (Domestic Relations Law § 70 [a]). There are, beyond this, essentially only two other specific considerations that the Legislature has said the courts must consider. These considerations are (1) evidence of domestic violence (Domestic Relations Law § 240 [1] [a]) and (2) if a parent has murdered the child’s other parent, legal guardian or a sibling. (Domestic Relations Law § 240 [1-c] [a].)[7] With the paucity of statutory direction in the area of custody and visitation and the various formulations of the best interest standard, it is clear why the courts have taken on the task of completing the portrait of the law on this subject. Given that the Legislature has declined to legislate more expansively on this subject, despite the dramatic evolution in the make-up and social dynamics of the American family in the latter half of the 20th century, one can infer that the Legislature is satisfied with the courts’ filling in the interstices of child custody law, wide though they may be. However, filling in an interstice of the law is one thing and judicially inventing new rights is something else. To this court’s mind, there is simply no statutory basis for extending visitation rights to a former foster mother. Furthermore, binding case law makes it clear that, at least in New York, the reasonable trajectory of Judge-made law that has extended custody and visitation rights to nonparents does not extend to a former foster parent as presented by the facts of this case. (Matter of Alison D. v Virginia M., 77 NY2d 651, supra; Matter of Bennett v Jeffreys, 40 NY2d 543, supra; Matter of Ronald FF. v Cindy GG., 70 NY2d 141, supra; Matter of Bessette v Saratoga County Commr. of Social Servs., 209 AD2d 838.) If there is a legal basis for judicially recognizing a right that will entitle the child and the foster mother involved in this case to maintain *137 contact when custody has been returned to the father, it is not to be found in statutory or common law. It is not found in statutory law because it simply does not exist. It does not exist in common law because there exists no legal evolution over any significant period of time that provides a footing to expand the rights of “psychological” parents at the expense of the rights of biological parents. In this area, the courts’ expansion of non-parents’ custodial rights to children came to a virtual standstill with Bennett v Jeffreys (supra), decided almost 25 years ago. In fact, Bennett v Jeffreys was only an incremental change in the law in this area. Prior case law had clearly established that the parens patriae authority of the State supported an award of custody to a nonparent where there was proof of abandonment, surrender or unfitness. (People ex rel. Kropp v Shepsky, 305 NY 465.) This is not surprising, since the categories themselves essentially define the results. In Bennett v Jeffreys (at 549), the Court extended the above categories to include “unfortunate or involuntary extended disruption of custody, or other * * * rare extraordinary circumstance which would drastically affect the welfare of the child.” With the number of qualifiers present in that holding, the Court of Appeals ventured not far out on the judicial limb.
Based on Bennett v Jeffreys (supra) and its progeny, it is clear that the foster mother has no statutory or common-law right to visitation with a former foster child and her petition must be denied on these grounds.

. The court does find that the child may have an independent and constitutionally protected liberty interest in maintaining, under certain well-defined and narrow circumstances, long-established emotionally nurturing relationships. If this was established, the child would have standing, independent of his parent, to assert a claim to continued contact with his foster mother. However, because the record does not establish, at this point, the Law Guardian’s position on continued contact between the foster mother and the child, the court is reserving on this issue to allow the Law Guardian to take such a position.

. Putting this case into the correct legal framework to permit the proper legal analysis is a difficult task. The Appellate Division remanded this case for a parental fitness hearing without specifying what form this hearing was to take. For example, when the child was in DSS custody, the father filed a Family Court Act article 6 custody petition. The Appellate Division, in noting this, slipped into a Bennett v Jeffreys analysis (Matter of Bennett v Jeffreys, 40 NY2d 543). The court does not believe this is the correct approach. First, a parent seeking custody of a child in DSS custody should file a petition under Family Court Act § 1062 to terminate placement. It is common for Family Courts to allow the filing of an article 6 custody petition in an article 10 placement context, but this is done more for clerical expediency than procedural exactness. After all, article 6 proceedings are meant to determine *129 custody disputes between parents and this calls forth a pure best interest test. Having said this, negotiating the maze of statutory cross references can be bewildering. For example, in a termination of placement hearing, Family Court Act § 1065 instructs the court to make a determination of whether continuation in placement “serves the purposes of this article.” Family Court Act § 1011 states that the purpose of the article is to protect children from harm and to insure that their needs are being met. However, Family Court Act § 1065 (b) states that if there is a finding that continued placement is not appropriate then the child shall be discharged from DSS custody “in accord with section three hundred fifty-four [sic].” Since there is no section 354 in the Family Court Act or in the Social Services Law, one can only presume that the Legislature meant Family Court Act § 1054. The problem with this is that section 1054 requires that, if the discharge is to the parent’s custody, it must be accompanied by an order of supervision. However, there would be no justification or legal basis to issue such an order against a nonneglectful parent.
The court could liken this present proceeding to a foster care review under Social Services Law § 392 (6) and apply a Michael B. modified best interest test. (Matter of Michael B., 80 NY2d 299.) But such a test involves the weighing of continued placement with the then fitness of a judicially determined neglectful placement. (True, it could also involve a parent who had voluntarily placed his or her child.) Or, the court could turn to Social Services Law § 383 (1) which requires the court to make a determination that “the interest of such child will be promoted” by the return to his parent and that the parent “is fit, competent and able to duly maintain, support and educate such child.” As one can see, the best interest standard can be formulated in many ways and arise in many contexts. The court can leave this dilemma to another day. Based on the findings made by the Appellate Division, the extensive record available to the court and the consent of DSS and the Law Guardian, a return of custody to the father was warranted based on any formulation of the best interest test and without the need to conduct a further evidentiary hearing.

. The language in question was added to the Social Services Law in 1972. (L 1972, ch 645.) In a memorandum for the Governor, Attorney General Lefkowitz stated as follows: “Foster parents, by the very nature of their agreement with the placing agency, have only temporary custody of a child and have no personal legal interest which they may advance or which needs protection. The bill does not give the foster parents the right to seek permanent or adoptive custody of a child in such a proceeding, but only the undefined right of intervention.” (May 10, 1972, Bill Jacket, L 1972, ch 645 [emphasis added].)

. Which “best interest” standard a court is to use in the varied and multi-faceted fact situations presented to it is not free from doubt. In short, the Court of Appeals has held that there is a best interest standard and then there is a best interest standard. First there is the “pure” best interest standard that must be applied in a custody dispute between two parents or in a Bennett v Jeffreys situation. Then there is the modified best interest as described by the Court of Appeals in Matter of Michael B. (80 NY2d 299, supra). Michael B. involved a foster care review after a voluntary placement under Social Services Law § 392. The Court held that the best interest test in that context did not involve a measuring of the biological parent against the foster parent. Rather, the court must weigh the past and future foster care placement of the child against discharge of the child to the biological parent. In short, best interest in this situation becomes a determination of parental fitness, even though harm to the child based on a dislocation from a long-bonded relationship with a foster parent must also be considered. It should be noted that by the time the Court of Appeals remitted this case back to Family Court for yet another hearing, the child in question had been in foster care for over seven years. His case had been heard twice in Family Court, twice by the Appellate Division and once by the Court of Appeals.

. In Ronald, FF. (supra), the father had a four-year relationship with the mother. He attended the mother’s childbirth courses, was present at the birth of the child and was listed on the birth certificate as the child’s father. After the parties separated, the mother initiated support proceedings against the “father.” It was not until the mother planned to move to Texas that the issue of paternity was raised in a Family Court proceeding brought by the “father” to prevent the move. It is not clear why the issue of estoppel was not raised and determined before blood grouping tests were done. The appellate courts have instructed us very clearly that estoppel issues must be determined prior to ordering genetic marker tests. (Mancinelli v Mancinelli, 203 AD2d 634.) The Court of Appeals in Ronald FF. is silent on the estoppel issue. It is also hard to reconcile the Appellate Division’s decision in Matter of Lorie F. v Raymond F. (239 AD2d 659) with the Court of Appeals’ decision in Ronald FF. The Court of Appeals held that the Bennett v Jeffreys standard *134 should not be extended to grant visitation rights to a nonparent, while the Appellate Division, Third Department, in Lorie F. used an estoppel argument to permit such visitation. Both involved cases where a “father” had stepped up to the plate to be an active parent in the child’s life. Also hard to reconcile with Lorie F. is the Third Department’s decision in Matter of Cindy P. v Danny P. (206 AD2d 615). In Cindy P. the Court denied standing to a stepparent, on the authority of Ronald FF., even though a stipulation on visitation was incorporated into a Family Court order. The Court also cited to Matter of Canabush v Wancewicz (193 AD2d 260) for the proposition that, as a matter of public policy, one may not stipulate away a child’s right to be reared by its biological parent. The Cindy P. Court makes no mention of the estoppel issue. For a thorough and thoughtful discussion of the application of equitable estoppel to custody disputes see Judge Amodeo’s decision in Matter of Christopher S. v Ann Marie S. (173 Misc 2d 824) and Judge Cooney’s decision in Matter of J. C. v C. T. (184 Misc 2d 935 [2000]). See also Jean Maby H. v Joseph H. (246 AD2d 282) for the proposition that Ronald FF. and Matter of Alison D. v Virginia M. (77 NY2d 651) cannot be blindly applied and that the Court of Appeals has put renewed and greater emphasis on best interest determinations in this whole area, as evidenced by the Matter of Tropea v Tropea relocation case (87 NY2d 727).

. It is interesting to note that this statute, concerning the denial of custody or visitation to a murderer, refers to any “person” who falls into this category while the rest of the statute refers to parents. This would obviously be a reference to Domestic Relations Law §§71 and 72, where visitation can be granted to nonparents such as siblings and grandparents. It is also noteworthy that the sibling visitation section does not give standing to stepsiblings but the proscriptions of Domestic Relations Law § 240 (1-c) (a) extend to the murder of a stepsibling.