OPINION OF THE COURT
W. Dennis Duggan, J.
In this case, the Court holds that a child has an independent, constitutionally guaranteed right to maintain contact[1] with a person with whom the child has developed a parent-like relationship.[2]
That right is constitutionally guaranteed because it is a fundamental liberty encompassed within the freedom of as *88 sociation right of the First Amendment[3] of the United States Constitution and article I, §§ 8 and 9 of the New York Constitution.[4] This liberty is protected by the Due Process Clause of the Fourteenth Amendment and article I, § 6 of the New York Constitution. Because the state has provided no statutory basis for a child to assert such right of contact in a court of law, as it has for similar situations involving child contact with parents, grandparents and siblings, Alex Ryan, Jr., has been denied the equal protection of the laws guaranteed by the Fourteenth Amendment of the US Constitution and article I, § 11 of the New York Constitution.[5]
I. Procedural History
The procedural history of this case is fully described in Matter of Alex MM. (260 AD2d 675 [Ryan I]), Matter of Alex LL. v Albany County Dept. of Social Servs. (270 AD2d 523 [Ryan II]) and in Webster v Ryan (187 Misc 2d 127 [Ryan III]). A brief factual summary follows: Alex, Jr., was born in 1995, with a positive toxicology for cocaine. He was removed from his mother’s custody shortly after birth. Her parental rights were eventually terminated, as were the father’s in 1999. Both parents’ terminations were based on permanent neglect. During the time that the Department of Social Services (DSS) was providing services for the mother, the father was filing at least *89 four custody proceedings.[6] All of the father’s petitions were dismissed by the Family Court judge without a hearing. According to the trial court, the petitions were “dismissed due to [the father’s] unwillingness to partake in services recommended by [DSS].” (Ryan II at 529, n 1.) For the years from 1995 to 1998, the father received one hour of DSS-supervised visitation each week. In reviewing the denial of the father’s custody petitions, the Appellate Division held:
“In fact, the records in these proceedings reveal no evidence that the father would not be a proper custodian for the child or that the child would be at risk in his custody. To the contrary, despite Family Court’s limitation on the evidence received, the record generally supports a finding that the father is qualified to serve as a custodian for the child.” (Ryan II at 526.)
Concerning the termination of parental rights finding, the Appellate Division held that DSS made no effort to satisfy its burden of showing that it had formulated a realistic plan that was tailored to fit the father’s circumstances. It also held that the Family Court judge “repeatedly thwarted the father’s efforts to establish the lack of any reasonable basis for the plan that was put in place * * * Obviously, the petition should have been dismissed at the conclusion of DSS’ case, if not earlier.” (Ryan II at 527.) The Appellate Division, in finding that the Family Court judge had demonstrated hostility toward the father and his attorney, ordered that all further proceedings be conducted before a different judge.
Upon remand, in Ryan III, this Court returned custody of the child to the father and entered a series of visitation orders to facilitate the transition of the child back into the father’s home. During this period of time, the foster mother filed petitions seeking visitation and custody rights to Alex, Jr. This Court, in Ryan III, rejected the foster mother’s claims. It found that there was no statutory, common law or constitutional *90 basis to grant visitation to a nonbiological, former custodian. The Court reserved on the question of whether the child has an independent constitutional right to seek visitation with his former foster mother and allowed the parties and the Law Guardian time to brief the issue. This decision answers that question in the affirmative. From Alex, Jr.’s birth in 1995 until April 2000, when he was returned to his father, the boy had lived with the foster mother for all of his life but for a few weeks.
II. Determination of Fundamental Rights
In this case, the Court has concluded that a child has a fundamental right to maintain contact, over the objection of a parent, with a person with whom the child has developed a parent-like relationship. The Court also holds that this right has constitutional protection but that this right must be balanced with the unquestionable fundamental right of the parent to raise his son without undue state interference.
The judicial determination (disparagingly described by some as “discovery”) of fundamental rights has long been a subject of great debate in the legal and judicial professions.[7] There is, admittedly, no consensus on either side of the debate. On the restraint side, there is no agreement on their main point, which is that rights cannot be judicially discovered or determined outside the four corners of the Constitution. On the expansion *91 ist side, there is no agreement about where rights originate or how they are determined. In fact, there is no agreement by either side as to whether any particular judge is on any particular side at any particular time. Also, a judge’s membership on either side can change, depending upon whose constitutional ox is being gored.[8]
A judge, wading into the constitutional rights determination quicksand, must have an abiding concern that he not set himself up as a judicial legislature. This concern goes back at least to the debate between Justices Chase and Iredell in Calder v Bull (3 Dallas [3 US] 386 [1798]). In Calder, Justice Chase set forth the proposition that the Court had the authority to set aside legislation that infringed on rights having their source in natural law. Justice Iredell countered that, even if a legislative act violated natural law, the Court, in setting the law aside, would be exercising powers not granted it by the Constitution.
So, where do fundamental rights come from? They cannot come from our Constitution in the sense that the Constitution itself grants or bestows rights on the governed. After all, a constitution is nothing more than a compact (though a very important one) among the governed as to how they wish to organize their government and what powers it should have and not have. A constitution may create nonfundamental rights and protect or guarantee specific fundamental rights. But, if a constitution was a source of fundamental rights, this would mean that people could confer these rights upon themselves. To so hold would be to say that there were no fundamental rights before the Constitutional Convention of 1787 and those rights were first created in that Convention. The absurdity of that argument is illustrated by just stating it. A constitution may be the repository of rights and even the source of some important rights, but not the source of fundamental rights. At this point, the definition of a fundamental right may have an air of circularity to it. Suffice it to say that if a right can be created by majority vote then it can be extinguished in the same way. For a right to be fundamental, it must be exempt from that process. The obvious reason for this is that for a right to *92 be fundamental, whatever that right may be, it must have some transcendental quality and such a right could not have been created by a majority vote of the 39 men who signed the Constitution. It could have been enumerated by them to the extent they chose to do so, but not created by them.
Proof that the People possess other rights, not contained in or derivative of the Constitution, comes from three powerful positive sources: the Declaration of Independence, the Constitution and the Bill of Rights.
The Declaration of Independence, in its second paragraph, states:
“We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.” (Emphasis added.)
This Declaration, written by Jefferson, influenced heavily by Locke,[9] states that our rights come from our creator (whether that be a personal God, a deity, or just inherent in the unique dignity of humanness). It also states that our rights are unalienable; that is, they are not capable of being invested or divested, and that among those rights are life, liberty and the pursuit of happiness.[10] Life, liberty and the pursuit of happiness, according to the Declaration of Independence, is not an all-inclusive list of rights. Because the Declaration predates the Constitution, it is clear that every right we possess need not be found in, nor can be distilled from, some stated right in the Constitution. Nor can every right we possess be found *93 reposing in a penumbra[11] of some collection or amalgam of these enumerated rights.
The second evidentiary source for the proposition that all of our rights are not contained in the Constitution is the Constitution itself. The Constitution, as first passed, had no bill of rights at all. The Delegates to the Convention did not believe one was necessary. It was not necessary, in the Framers’ view, because the Constitution, as written, gave the Federal Government no power to abridge any fundamental rights.
“James Wilson, a delegate from Pennsylvania, told a meeting of Pennsylvania citizens that a bill of rights would not only have been unnecessary but impracticable. ‘Enumerate all the rights of men? I am sure that no gentleman in the late convention would have attempted such a thing.’ The new Constitution in Wilson’s view was not a body of fundamental law which would require a statement of natural rights. Rather it was municipal law, positive law — what in medieval days was called jus civile. Not a declaration of eternal rights but a code of reference.” (Catherine Drinker Bowen, Miracle at Philadelphia at 245-246 [Little Brown 1966].)
The last vote for a bill of rights was taken on the last day of the Constitutional Convention. It was defeated 10-0. (Bowen at 244.)
During the ratification debates, Hamilton, in Federalist No. 84, explained why the Constitution needed no bill of rights.
“I go further and affirm that bills of rights, in the sense and to the extent in which they are contended for, are not only unnecessary in the proposed Constitution, but would even be dangerous. They would contain various exceptions to powers which are not granted; and on this very account, would offer a colorable pretext to claim more than were granted. For, why declare that things shall not be done which there is no power to do? Why, for instance, should it be said that the liberty of the press shall not be restrained, where no power is given by which restrictions may be imposed?”[12]
*94 The final element of proof which establishes that all of our rights are not bestowed by or contained in the Constitution comes from the Bill of Rights itself — Amendment IX provides:
“The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.” (Emphasis added.)
Amendment X provides:
“The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people” (emphasis added).
Amendment XIV, § 1 provides:
“No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.”
These three Amendments all speak to rights held by the People that are not listed in the Constitution. Knowing that other rights exist, how are they to be determined and who should do the determining, the judiciary or the legislature? Most would readily agree that the legislature has the authority to determine rights or even create new rights. For example, the legislature could determine that the people have a right to universal health care. It is doubtful that the judiciary could make such a determination.
“When Mr. Justice Holmes, speaking for this Court, wrote that fit must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts,’ * * * he went to the very essence of our constitutional system and the democratic conception of our society.”[13]
The question to be asked here is, what is the judiciary’s proper *95 place in the rights determination business? It is clear that the Constitution does create some rights that would not be considered fundamental (e.g., the prohibition against bills of attainder and ex post facto laws). It is also clear that the Constitution protects or guarantees many other rights, some of which are now (but were not always) universally regarded as fundamental (e.g., freedom of speech and religion).[14] Finally, it is clear that other rights determined by the courts to be possessed by the people are not specified in but are protected by the Constitution. For example, the rights to travel (Edwards v California, 314 US 160 [1941]), to marry (Loving v Virginia, 388 US 1 [1967]), and to privacy (Griswold v Connecticut, 381 US 479 [1965]) are rights protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment, but they are not listed anywhere in the Constitution.[15]
The above discussion shows that if a right exists for a child to maintain contact with a person with whom he has developed a parent-like relationship, it will not be found explicitly or inferentially set forth in the Constitution, but it need not be. *96 However, if such a right exists, and this Court holds that it does, that right has constitutional protection because it is a fundamental right and the Constitution protects our fundamental rights from unwarranted state intrusion or exclusion.[16] The search for such a right must begin with the Supreme Court’s Talmudic exposition of our Constitution.[17]
If one scans 200 years of Supreme Court decisions that define, determine or discover rights (however one defines the process)[18] and the work of legal scholars who have written on the subject, one is left quite disoriented from trying to find any consistently applied, generally agreed upon, theory of constitutional interpretation.[19] Evidence of this can be seen in almost any 5-4 Supreme Court decision where, among the majority and minority decisions, there are pluralities and sub-pluralities. These decisions literally provide something for everyone. This process begets other 5-4 decisions in the same area of law. The end result produces modifications, exceptions, qualifications and permutations that make the law unintelligible to trial judges, police, administrators and the public. For example, the law of search and seizure has reached such a *97 state of complexity and confusion that a police officer, riding with a Supreme Court Justice, could not be expected to apply the law consistently. Observing critically on this issue is Joseph Goldstein, Sterling Professor of Law Emeritus at Yale Law School, in The Intelligible Constitution: The Supreme Court’s Obligation to Maintain the Constitution as Something We The People Can Understand (Oxford Univ Press 1992). He illustrates the cacophony with which the Supreme Court often speaks by citing the introductory note to Arizona v Fulminante (499 US 279, 281 [1991]). It reads as follows:
“White, J., delivered an opinion, Parts I, II, and IV of which are for the Court, and filed a dissenting opinion in Part III. Marshall, Blackman, and Stevens, JJ., joined Parts I, II, III, and IV of that opinion; Scalia, J., joined Parts I and II; and Kennedy, J., joined Parts I and IV. Reinquist, C. J., delivered an opinion, Part II of which is for the Court, and filed a dissenting opinion in Parts I and III * * * O’Connor, J., joined Parts I, II, and III of that opinion; Kennedy and Souter, JJ., joined Parts I and II; and Scalia, J., joined Parts II and III. Kennedy, J., filed an opinion concurring in the judgment.”
Professor Laurence H. Tribe, in Constitutional Choices (at 3-5), remarks on the problems of explaining how these constitutional choices can be validated as legitimate. He was moved, he said, “by a sense of the ultimate futility of the quest for an Archimedean point outside ourselves from which the legitimacy of some form of judicial review or constitutional exegesis may be affirmed.”
Somewhat at the other end of the judicial interpretive spectrum is Judge Richard A. Posner of the United States Court of Appeals for the Seventh Circuit. Quoting him at length from Overcoming Law, he expresses the same sentiment but more vividly.
“There are two ways * * * in which judges can go wrong. The ‘fundamental values’ approach goes wrong by being too willing to make political judgments. ‘Clause-bound interpretivism’ goes wrong by not being willing enough to make political judgments, with the result that substantive injustices are ratified, even reveled in the name of the rule of law. The first mistake invites charges that the judges are being lawless, the second that *98 they are being heartless. The first invites charges that the judges are elitist, anti democratic, arrogant in setting their judgment against that of the people’s representatives, the second that they are too quick to yield to populist pressures, too insensitive to the danger of tyranny by the majority, too pious and credulous about the ideology of democracy, too callous, too servile — even cowardly. The objection to naming the avoidance of these extremes ‘interpretivism’ is that it implies the existence of an objective technique, such as cryptograph, or translation, or reading a chest x-ray for signs of pulmonary disease, that, if only judges would adhere to it, would prevent them from going to either of the bad extremes. If there is such a technique— something to lift free constitutional ‘interpretation’ above the reading of palms and the interpretations of dreams — no one has discovered it.” (Posner at 199, n 7 [emphasis added].)
Despite the absence of a legislative road map or clearly defined constitutional sign posts or a generally accepted method of rights determinations to provide guidance, courts, since courts began, have been determining rights.[20] These rights have been birthed from statutes, bills of rights, constitutions, natural law and the common law.
“As Chief Justice Coke said in the famous case of Dr. Bonham in 1610, if a statute should turn out to be against the reason of the common law * * * then the common law would control it and adjudge such an act to be void.” (Gordon S. Wood, A Matter of Interpretation at 60.)[21]
*99 In recognizing that courts do determine rights and have been doing so for several hundred years, a court has a duty to describe what guideposts it is using when it determines that a right exists which was previously unrecognized (or at least unrecognized in a particular context). Admittedly, this exercise is somewhat like a ship tacking into the wind. Each jig or jag of a judicial theory thrusts off in one direction until it requires corrective action to bring the law back on course. The polestar that guides this process must first be the faithfulness of a judge to his or her oath of office, always conscious that the People are the final repository of all rights and powers. With this guide, the course of judicial decisionmaking has moved steadily (though not unvaryingly) forward with a consistent expansion of the individual rights of the governed.
The judiciary has no equivalent of the Rosetta Stone or Dead Sea Scrolls to divine the Framers’ intent or unlock the original understanding of constitutional text when making a decision that determines a right or expands a recognized right. However, there must still be a faithfulness to the text of the Constitution, a respect for the traditions and values of our society and a deference to legislative authority.[22] The court must follow, as Justice Scalia has described it, the “trajectory” of the Constitution (A Matter of Interpretation at 45). At the same time, the court must be cognizant of the errors that can be induced by incrementalism. With enough small steps, one can reach almost any legal conclusion. The final decision will seem so modest a change and the result so reasonable that the conclusion will almost appear to be self-evident.
“When therefore the State by its judges attempts to *100 mark the respective limits of liberty and government, it must draw the line in such a way that the individual and the group, and the life appropriate to each, may have scope and opportunity for harmonious development. The location of this line is the overshadowing problem of liberty and law.” (Benjamin N. Cardozo, The Paradoxes of Legal Science at 309 [Yale Univ Press 1921].)
As would be expected, Cardozo, speaking in a somewhat different context and with his typical felicitous use of language, has provided as clear a benchmark as can be distilled from the several dozens of Supreme Court cases on this subject. However, the Court’s Griswold decision is as good a starting point as any to examine how the Supreme Court drew the line of liberty in such a way that the individual and the group, and the life appropriate to each, were given scope and opportunities for harmonious development.
In Griswold v Connecticut (381 US 479 [1965]), the Supreme Court ruled unconstitutional a Connecticut law which made it a criminal offense for a doctor to counsel married couples about contraceptive methods. Justice Douglas, in delivering the majority opinion, recounted the progression of cases that granted persons protection against various types of governmental intrusions. He concluded:
“The forgoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance * * * Various guarantees create zones of privacy.” (Griswold at 484 [emphasis added].)
Today the holding in Griswold would be uncontroversial. In fact, most people would probably be quite surprised to learn that just 35 years ago it was a criminal offense for a doctor to give birth control advice — and to a married couple no less. However, the method by which the Supreme Court arrived at its conclusion that the Connecticut law was unconstitutional was then, and continues to be, quite controversial. It was probably an unfortunate choice of words for Justice Douglas to associate rights with a “penumbra,” a word borrowed from optics and astronomy which is associated with shadows or darkened regions. In constructing the “penumbra theory,” Justice Douglas was dealing with two main problems. First, the Constitution nowhere mentions a right to privacy. Second, the Supreme Court purportedly laid to rest, only two years earlier, *101 the oxymoronic concept of “substantive due process.” (Ferguson v Skrupa, 372 US 726 [1963].)
The concept of substantive due process, first articulated by Chief Justice Roger B. Taney in Dred Scott v Sandford (60 US 393 [1856]), was used as a basis to overrule the Missouri Compromise.[23] This legal concept got off to a rocky start in what is now considered the worst Supreme Court decision ever rendered. Substantive due process never really found solid, generally accepted, constitutional legs. One reason for this is that the concept was used primarily not to protect individual rights, but to protect private economic interests. However, it still had a sustained use in this fashion for some 80 years, ending, for all practical purposes, in 1937 with West Coast Hotel Co. v Parrish (300 US 379). That case involved the famous “switch in time that saved nine.” A one-judge realignment of the usual 5-4 court split resulted in the upholding of Washington State’s minimum wage law and effectively ended President Roosevelt’s “court packing” plan. However, during that 80-year period, a significant number of business and workplace regulatory laws were declared unconstitutional.
Substantive due process got a second life when the court started ruling unconstitutional, legislation that restricted individual personal liberties as opposed to economic liberties. However, the primary criticism of the concept of substantive due process remained the same. It allows courts to “substitute their social and economic beliefs for the judgment of legislative bodies who are elected to pass laws.” (Skrupa at 730 [Black, J.].) For these reasons, and writing only two years after Skrupa, Justice Douglas would have had a hard time yoking substantive due process to a right of a married couple to obtain contraceptives from their doctor. In truth, Griswold was a substantive due process case and Justice Goldberg (with Chief Justice Burger and Justice Brennan concurring) met that head on.
“I do agree that the concept of liberty protects those personal rights that are fundamental, and is not confined to the specific terms of the Bill of Rights. My conclusion that the concept of liberty is not so restricted and that it embraces the right of marital *102 privacy though that right is not mentioned explicitly in the Constitution is supported by both numerous decisions of this Court, referred to in the Court’s opinion, and by the language and history of the Ninth Amendment * * * [T]he Ninth Amendment shows a belief of the Constitution’s authors that fundamental rights exist that are not deemed exhaustive.” (Griswold at 486-487.)
Dissenting in Griswold, Justice Black itemizes the “collection of catchwords and catch phrases invoked by judges who would strike down under the Fourteenth Amendment laws which offend their notions of natural justice.” (Griswold at 513, n 4.) These include the following:
1. The Court can forbid action which “shocks the conscience.” (Rochin v California, 342 US 165, 172.)
2. State legislation may not run counter to the “decencies of civilized conduct.” (Rochin at 173.)
3. A law may not violate “some principle of justice so rooted in the traditions and consciences of our people as to be ranked as fundamental.” (Snyder v Massachusetts, 291 US 97, 105.)
4. A law may not violate “those canons of decency and fairness which express the notions of justice of English-speaking peoples.” (Malinsky v New York, 324 US 401, 417.)
5. A law may not violate “the community’s sense of fair play and decency.” (Rochin at 173.)
6. A law may not conflict with “deeply rooted feelings of the community.” (Haley v Ohio, 332 US 596, 609.)
This list could easily go on with another dozen variations on the same theme. The criticism layered on the judiciary on this point is, who is supposed to determine what these deeply rooted traditions and feelings of the community are? Uncovering the traditions and feelings of the community seems like a very difficult place to search for rights. Where does the search start, Fifteenth century England? What feelings? Whose traditions? In fact, many of the rights protecting provisions of the Magna Carta and the Constitution are antitradition.[24] The separation of church and state is one of the more obvious examples. If one *103 attempts to look for tradition and the conscience of the community, as expressed in the Constitution, one is met with a document that initially protected slavery[25] and where the notion of extending the vote to women never seriously crossed the Framers’ minds.[26]
Any earnest search for tradition would again get derailed at the time of the passage of the Civil War amendments. The conscience of the community in 1867 had no qualms about segregated schools. In that period, several states, including New York, mandated segregated schools.[27] It took almost 100 years for the Supreme Court to set aside this legislatively established policy on constitutional grounds. (Brown v Board of Educ., 347 US 483 [1954].) Enforcement issues, created by both de facto and de jure segregation, added an additional 40 years to the struggle to end school segregation.
If one is to look for “tradition” or some “sense of decency and fairness rooted in the community so as to be considered fundamental,” by examining the Supreme Court’s journey down that path, one must start fairly recently. Slavery, as noted, was protected in the Constitution and this “peculiar institution” certainly did not bother any judicial notion of the community’s sense of justice and decency in the first half of the *104 nineteenth century.[28] In 1857, in the Dred Scott decision, “the Supreme Court had written two new rules into the fundamental law of the nation: first, that no Negro could be a United States citizen or even a state citizen ‘within the meaning of the Constitution’; and second, that Congress had no power to prohibit slavery in the territories, and that accordingly all legislation embodying such prohibition, including the Missouri Compromise, was unconstitutional.” (Fehrenbacher at 4, n 23.) Forty years after Dred Scott and 30 years after the Fourteenth Amendment was passed, the Supreme Court was still expounding on the community’s traditions about race that were then held to be fundamental. We would now consider those traditions to be repulsive. In Plessy v Ferguson (163 US 537 [1896]), the Supreme Court gave constitutional protection to the concept of “separate but equal” facilities for blacks and whites. “If one race be inferior to the other socially, the Constitution of the United States cannot put them on the same plane.”[29] (Plessy at 551-552.) It seems clear that traditions and various virtues rooted in the community provide an unreliable compass to point to fundamental rights. Despite all of the criticism of the concept of “substantive due process,” the judiciary found it too useful as a tool of interpretational analysis and had nothing else of equivalent power to fall back on. So, despite its reported demise, it is still alive and well. “Neither the Bill of Rights nor the specific practices of the States at the time of the adoption of the Fourteenth Amendment marks the outer limits, of the substantive sphere of liberty which the Fourteenth Amendment protects.” (Planned Parenthood v Casey, 505 US 833, 848 [1992].)
However these liberty rights are found, the Supreme Court’s progression of rulings on issues affecting family privacy rights does show a fairly consistent trend. This trend expands the rights of families and individual family members.
1. In Meyer v Nebraska (262 US 390 [1923]), the Supreme Court ruled unconstitutional a Nebraska law which prohibited the teaching of any foreign language in any elementary school.
*105 2. In Pierce v Society of Sisters (268 US 510 [1925]), the Supreme Court ruled unconstitutional an Oregon statute which required all children to attend public schools.
3. In Skinner v Oklahoma (316 US 535 [1942]), the Supreme Court declared unconstitutional the Oklahoma Criminal Sterilization Act. It declared that Skinner, who had two convictions for robbery and one for stealing chickens, had a fundamental right to procreate.
4. In Griswold v Connecticut (381 US 479 [1965]), the Court held unconstitutional a law which prohibited the dissemination of contraceptive materials to married couples.
5. In Levy v Louisiana (391 US 68 [1968]), the Court ruled unconstitutional a Louisiana law that prohibited illegitimate children from recovery for the wrongful death of their mother.
6. In Glona v American Guar. & Liab. Ins. Co. (391 US 73 [1968]), the Court ruled unconstitutional a Louisiana Law which denied the right of a mother to recover for the wrongful death of her child because the child was illegitimate.
7. In Loving v Virginia (388 US 1 [1967]), the Court held unconstitutional a Virginia law which prohibited interracial marriages.
8. In Eisenstadt v Baird (405 US 438 [1972]), the Court ruled unconstitutional a Massachusetts law which prohibited the distribution of contraceptives to unmarried people.
9. In Weber v Aetna Cas. & Sur. Co. (406 US 164 [1972]), the Court held unconstitutional a Louisiana law which denied workers’ compensation benefits to an unacknowledged illegitimate child.
10. In Carey v Population Servs. Intl. (431 US 678 [1972]), the Court ruled unconstitutional a New York law which permitted only pharmacists to sell contraceptives to adults and a blanket prohibition on such sales to minors.
11. In Wisconsin v Yoder (406 US 205 [1972]), the Court held that the state could not require parents of the Amish Church to send their children to public school after the eighth grade.
12. In Roe v Wade (410 US 113 [1973]), the Court ruled that the state cannot prohibit a woman from terminating a pregnancy during the first two trimesters of her pregnancy because it violates her fundamental privacy right.
13. In Gomez v Perez (409 US 535 [1973]), the Court ruled unconstitutional a Texas law which prohibited illegitimate children from claiming child support from their father.
14. In Cleveland Bd. of Educ. v LaFleur (414 US 632 [1974]), the Court held unconstitutional mandatory maternity leaves.
*106 15. In Planned Parenthood v Danforth (428 US 52 [1976]), the Court held that the state could not require spousal consent as a predicate for a woman having an abortion or give a parent veto power over a minor’s decision to have an abortion (a competing rights case).
16. In Moore v City of E. Cleveland (431 US 494 [1977]), the Court ruled unconstitutional a housing ordinance which prohibited a grandmother and her grandchildren from living together in a single dwelling unit.
17. In Caban v Mohammed (441 US 380 [1979]), the Court ruled unconstitutional New York’s adoption consent statute which gave the unwed mother of a child an automatic right to veto an adoption, while the father had to show that the adoption would not be in the child’s best interest.
18. In Clark v Jeter (486 US 456 [1988]), the Court held that a six-year statute of limitations in which to establish paternity violated the Equal Protection Clause.
Consistent with this progression of Supreme Court decisions that protect, extend and expand the liberty rights of individuals and families, and within the trajectory of the developed meaning of the Constitution, would be a holding that the state cannot deny (or in this case, refuse to enforce) the First Amendment rights of a child to associate with another person with whom the child has developed a parent-like relationship. If a child has such a right, and the Court holds that he does, and the state extends a procedure to protect or enforce similar rights of similar persons in similar situations, but excludes the child from the due process that protects that right, then the child has been denied the equal protection of the laws.
It has been firmly established that children áre persons within the meaning of the Constitution and accordingly possess constitutional rights. Precisely defining these rights has not been an easy task.
“The question of the extent of state power to regulate conduct of minors not constitutionally regulable when committed by adults is a vexing one, perhaps not susceptible of a precise answer. We have been reluctant to attempt to define ‘the totality of the relationship of the juvenile and the state’ * * * Certain principles, however, have been recognized. ‘Minors, as well as adults, are protected by the Constitution and possess constitutional rights’ * * * ‘ [W] atever may be their precise impact, neither the Fourteenth Amendment nor *107 the Bill of Rights is for adults alone’ * * * On the other hand, we have held in a variety of contexts that ‘the power of the state to control the conduct of children reaches beyond the scope of its authority over adults’ * * * Thus minors are entitled to constitutional protection for freedom of speech * * * equal protection against racial discrimination * * * due process in civil contexts * * * and a variety of rights of defendants in criminal proceedings.” (Carey v Population Servs., 431 US 678, 692 [1977].)
In this case, there is no claim that the state is intervening in a family relationship for regulatory or parens patriae purposes. The narrow holding in this case is that a statutory scheme that permits court intervention to order contact between a child and a parent or his sibling or grandparent is an unconstitutional denial of a child’s right to equal protection of the laws when the law does not provide a procedure for the child to assert the same right with respect to a person with whom the child has a significant or substantial parent-like relationship. Since the Court holds that such a right is fundamental and constitutes a liberty interest under the Due Process Clause, the child must have an effective forum to assert that right.
III. Balancing the Fundamental Rights of a Parent and Child[30]
The Supreme Court has infrequently addressed the situation where constitutional interests between parents and their children compete, either with each other or with the state. In Prince v Massachusetts (321 US 158 [1944]), the Court held that the state’s child labor laws trumped the parent’s right to have her child engage in religious activity in public and the child’s independent right to do so. (The case involved the public distribution of the religious magazine Watchtower by the parent and child who were both Jehovah’s Witnesses.) Prince stands for the proposition that the state has parens patriae authority *108 over children up to a point and that point, wherever it may be, was not crossed in this case. Any interpretive methodology as to how a court is to make a determination like this is missing from Prince. In analogizing to the state’s authority to impose compulsory education of minors, the Court cites with approval State v Bailey (157 Ind 324, 61 NE 730 [1901]) which held, without any constitutional introspection:
“The natural rights of a parent to the custody and control of his infant child are subordinate to the power of the State, and may be restricted and regulated by municipal laws * * * The welfare of the child, and the best interests of society require that the State shall exert its sovereign authority to secure to the child the opportunity to acquire an education.” (Bailey, 157 Ind at 329, 61 NE at 731-732.)
Bailey, like Prince, is bereft of any constitutional interpretational analysis and silent on any attempt to balance a parent’s right to determine the best interest of his or her child with this assumed authority of the state to know what is best for children.
In Planned Parenthood v Danforth (428 US 52 [1976]), the Court was called on to balance the rights of a parent to the custody and control of his or her child and the right of the child to obtain an abortion, as guaranteed by Roe v Wade. The Missouri statute in question required parental consent for an unmarried woman less than 18 to obtain an abortion. The Court held that, in these circumstances, the child’s constitutional rights outweighed the parent’s.
“Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient’s pregnancy, regardless of the reason for withholding the consent.
“Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.” (Danforth at 74.)
In Santosky v Kramer (455 US 745 [1982]), the Supreme Court held that New York’s statutory scheme to terminate *109 parental rights was flawed because due process required that the fact-finding determination be made by clear and convincing evidence, as opposed to a preponderance of the evidence standard. The majority decision, essentially parent-focused, held that the risk of fact-finding error should be distributed toward the Department of Social Services and away from the parents. In so holding, the decision assumes an alliance or unity of interest between the parents and the child. The minority, in finding that due process was served by a preponderance of the evidence standard, which allocated the risk of error evenly between the parents and the agency, left the children in a neutral position.
“The child has an interest in the outcome of the fact-finding hearing independent of that of the parent * * * [T]he child’s interest in a continuation of the family unit exists only to the extent that such a continuation would not be harmful to him.” (Kramer at 790, n 13 [Rehnquist, J., dissenting].)
In Swann v Charlotte-Mecklenburg Bd. of Educ. (402 US 1, 5 [1971]), the Court sought “to review important issues as to the duties of school authorities and the scope of powers of federal courts under this Court’s mandate [as set forth in Brown v Board of Educ. (347 US 483 [1954])] to eliminate racially separate public schools established and maintained by state action.” The issue of a parent or a child’s right to have some say over where and how the child goes to school was completely missing from the Court’s discussion. The forced busing of a child to a distant school was an enormous governmental intrusion into a parent’s fundamental right to determine the best educational setting for the parent’s children. In Swann, this issue deserves no mention.
“School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities.” (Swann at 16.)
In Michael H. v Gerald D. (491 US 110 [1989]), the Court was called upon to determine the constitutionality of a California statute that provided that a child born to a married woman *110 living with her hu'sband, who is neither impotent nor sterile, is presumed to be a child of the marriage and that this presumption may be rebutted only by the husband or the wife. In this case, there was no factual dispute that the mother’s boyfriend was the father of the child. This was proven by blood test results indicating a 98.07% probability of paternity and by admissions of all the parties. In addition, the mother, boyfriend/ genetic-father and the child lived together for more than a year. At other times, the mother lived alternately with another man or her husband. Both the genetic-father and the child filed petitions for access with each other. The child claimed that she was denied the equal protection of the laws because both the mother and her husband could challenge the legitimacy presumption but not the child. As to the boyfriend/ genetic-father, the Court held that California’s irrebuttable presumption was, in reality, a substantive law that in effect stated that an “adulterous natural father shall not be recognized as the legal father.” (Gerald D. at 120.) In upholding the presumption against the boyfriend/genetic-father, the Court raised the legal test that “liberty rights must be rooted in history and tradition.”
“Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael [the boyfriend/genetic-father] and Victoria [the child] has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has.” (Gerald D. at 124.)
Read one way, Gerald D. stands for the proposition that biology is not destiny and the court will look to the family relationships or unit that best serves the child’s best interest, without regard to genetic parenthood.
“Where, however, the child is born into an extant marital family, the natural father’s unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter.” {Gerald D. at 129.)[31]
*111 The Court took 18 pages to dismiss the boyfriend/genetic-father’s constitutional claims. It needed only three paragraphs to dismiss the child’s.[32] Justice Scalia does note that: “We have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent in maintaining her filial relationship.” (Gerald D. at 110.) However, Justice Scalia also held that the child’s claim must fail because there was no basis in law, history or tradition for a child to make a claim for multiple fatherhoods.
“In contrast, allowing a claim of illegitimacy to be pressed by the child * * * may well disrupt an otherwise peaceful union. Since it pursues a legitimate end by rational means, California’s decision to treat Victoria differently from her parents is not a denial of equal protection.” (Gerald D. at 131-132 [emphasis added].)
This case, involving a married woman who had affairs of some duration with two other men and admittedly had a child out of wedlock, does not seem the best factual situation in which to raise an issue about disrupting “an otherwise peaceful union.” Also, Justice Scalia, by inserting at the end the phrase, “legitimate end by rational means,” puts the constitutional analysis of this case at the lowest level of scrutiny. However, the issues raised in this case and the precedents cited would support a higher level of constitutional scrutiny. Justice Stevens, concurring in the judgment, remarks on this as follows.[33]
“[Our] cases * * * demonstrate that enduring ‘family’ relationships may develop in unconventional settings. I therefore would not foreclose the possibility that a constitutionally protected relationship between a natural father and his child might exist in a case like this. Indeed, I am willing to assume for the purpose of deciding this case that Michael’s relationship with Victoria is strong enough to give him a constitutional right to try to *112 convince a trial judge that Victoria’s best interest would be served by granting him visitation rights.” 0Gerald D. at 133.)
In Tuan Anh Nguyen v Immigration & Naturalization Serv. (533 US 53 [June 11, 2001]), the Court examined the legislative scheme that determined how a child, born outside the United States, acquired citizenship when the parents were not married and when only one parent is a citizen, in this case the father. The case relates to this d.ecision insofar as it shows again how courts do not approach family-based constitutional issues from a child-focused point of view. Nguyen is analyzed from a gender-based, equal protection point of view. On a surface level, it should be. However, it can also be looked at as a child’s rights case that allocates a very important right, citizenship, based on the child’s relationship to his mother or father. It is surely true that motherhood and fatherhood are inextricably linked to gender, but when this case is looked at through the child’s eyes, gender becomes a secondary characteristic. When this happens, one can view the equal protection issue much differently. In this case, the question then becomes whether a child’s rights should be different depending on whether he gets them from his mother or father and not from a male or female who happens to be a parent.[34]
The citizenship acquisition statute examined in Nguyen conferred automatic citizenship on a child who was born overseas to a mother-citizen. However, if the father was the only citizen-parent, he had to take affirmative steps to establish parentage by the time the child was 18. Unexamined by either the majority or minority is that the child could do nothing by himself to establish the citizenship right that Congress gave to him based on his father’s citizenship. For example, there was no discussion of whether the heightened scrutiny that applies to gender-based distinctions, and the “means-end” test that goes along with it, should have required a tolling provision to permit the child a reasonable period of time to assert his citizenship right once he turned 18. Gerald D. and Nguyen look much different when viewed through the constitutional eyes of the child.
*113 The two cases that most directly impact the holding in this case are the Supreme Court’s grandparents’ visitation decision, handed down last year in Troxel v Granville (530 US 57 [2000]) and the New York Court of Appeals “de facto” parent visitation decision in Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]).[35] In Troxel (a 6-3 decision containing six separate opinions—three for and three against), the Supreme Court examined a Washington State statute that permitted any person to petition for visitation with any child at any time. The visitation could be granted with the court only having to consider whether the contact would be in the child’s best interest. The Supreme Court held that the Washington statute as applied was unconstitutional.[36] The first deficiency they noted in the statute was that in allowing any person at any time to apply for visitation, the law was “breathtakingly broad.” Secondly, the statute contained “no requirement that a court accord the parent’s decision any presumption of validity or any weight whatsoever.” (Troxel at 67.) At the fact-finding stage, the trial court (1) presumed that grandparent visitation was in the child’s best interest, (2) placed the burden on the parents to first articulate reasonable objections to the visits, and (3) the court articulated no “special factors” which would “justify the State’s interference with [the parent’s] fundamental right to *114 make decisions concerning the rearing of her two daughters.” (Troxel at 68.)[37]
Justice Stevens, in dissent (and Judge Kaye in dissent in Alison D., above) provides the analytical framework which, when the issue is examined from a point of view that first considers the child’s constitutional rights, supports the results in this case.[38] Justice Stevens is the only Justice to raise the issue of the child’s constitutional rights.
“Cases like this do not present a bipolar struggle between the parents and the State over who has final authority to determine what is in a child’s best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies — the child * * *
“While this Court has not yet had occasion to elucidate the nature of a child’s liberty interests in preserving established familial or family-like bonds * * * it seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation.” (Troxel at 86-88 [citations omitted].)
Stevens goes on to note that there is, in effect, a place at the constitutional table for a child in Alex Ryan, Jr.’s situation.
*115 “Even the Court would seem to agree that in many circumstances, it would be constitutionally permissible for a court to award some visitation of a child to a parent or previous caregiver in cases of parental separation or divorce, cases of disputed custody, cases involving temporary foster care or guardianship, and so forth.” (Troxel at 85.)
Justice Kennedy, also in dissent, lends support to the concept that, under appropriate circumstances, court-ordered visitation between a child and a nonparent is constitutionally permissible.
“My principal concern is that the holding seems to proceed from the assumption that the parent or parents who resist visitation have always been the child’s primary caregivers and that the third parties who seek visitation have no legitimate and established relationship with the child. That idea, in turn, appears influenced by the concept that the conventional nuclear family ought to establish the visitation standard for every domestic relations case * * *
“Cases are sure to arise * * * in which a third party, by acting in a caregiving role over a significant period of time, has developed a relationship with a child which is not necessarily subject to absolute parental veto.” (Troxel at 98.)
In Alison D. v Virginia M. (77 NY2d 651 [1991]), two women in a committed relationship decided to have a child. They agreed that Virginia would be artificially inseminated and bear the child. For about two and one-half years after the child’s birth, they both raised the child as joint custodians. The parties then terminated their relationship. However, for another two or more years, Alison continued visitation with the child. The child referred to her, as well as to Virginia, as “mommy.” Virginia then terminated Alison’s nearly five-year relationship with the child. Alison petitioned for visitation which was denied by the trial court. In a per curium opinion, the Court of Appeals held that there was no statutory basis for Alison’s petition. They also declined to read “de facto” parent into the definition of parent in Domestic Relations Law § 70. There was no mention of any constitutional right of the child or what might be in the child’s best interest.[39]
*116 In dissent, Judge Kaye grounds her legal argument on the fact that the law nowhere defines the word “parent” and she would do so to include a “de facto” parent. She would also read Domestic Relations Law § 70 so as to give meaning to the words: “In all cases * * * the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness.” In using Justice Stevens and Judge Kaye’s analytical framework, we still must balance the child’s constitutional rights with the parent’s.
In balancing the unquestionable constitutionally guaranteed right of a parent to raise his or her child on one hand and the constitutional right of a child to maintain contact with a parent-substitute (and the state intrusion in giving a court forum to voice that right) on the other hand, it will be helpful to examine other areas where a state does intrude into the parent’s constitutional right to raise his or her child free of state interference. By examining these circumstances, we can gauge the level of intrusion into the parent’s rights that are caused by recognizing this right for the parent’s child.
The bedrock principle of Troxel is that “[t]he liberty interest at issue in [this] case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by the [Supreme Court].” (Troxel at 65.) While that is undoubtedly true, the pedigree for that claim was Meyer v Nebraska (262 US 390), decided in 1923. Starting more than 100 years earlier than that, state courts were establishing a substantial body of law in which the state’s parens patriae authority was used to uphold child custodial rights of nonparents against the claims of parents. In 1816, in Matter of Waldron (13 Johns 418), the Supreme Court of Judicature of New York, on a best interest theory, kept a child with the grandparents against the claim of the father. In Maples v Maples (49 Miss 393 [1873]), the Supreme Court of Mississippi denied the petition of a mother *117 and upheld the continued custody of a teenage boy with his grandfather. In Bently v Terry (59 Ga 555 [1877]), the Supreme Court of Georgia denied the petition of a mother and continued the five-year custody relationship of the child with the child’s aunt. In Drumb v Keen (47 Iowa 435 [1877]), the Supreme Court of Iowa sustained the continued custody of a five-year-old child with his grandmother in the face of a claim by the boy’s father. See also the following cases, all granting or continuing custody of a child with a nonparent against the parent’s claim:
Chapsky v Wood, 26 Kan 650 (1881)
Verser v Ford, 37 Ark 27 (1881)
Smith v Bragg, 68 Ga 650 (1882)
Bonnett v Bonnett, 61 Iowa 199, 16 NW 91 (1883)
Sturtevant v State ex rel. Havens, 15 Neb 459, 19 NW 617 (1884)
Jones v Darnall, 103 Ind 569, 2 NE 229 (1885)
Bryan v Lyon, 104 Ind 227, 3 NE 880 (1885)
People ex rel. Curley v Porter, 23 Ill App 196 (1887)
Clark v Bayer, 32 Ohio St 299 (1877)
Hoxsie v Potter, 16 RI 374, 17 A 129 (1888)
In re Blackburn, 41 Mo App 622 (1890)
In re Gates, 95 Cal 461, 38 P 596 (1892)
Legate v Legate, 87 Tex 248, 28 SW 281 (1894)
Sheers v Stein, 75 Wis 44, 43 NW 728 (1889)
In re Vance, 92 Cal 195, 28 P 229 (1891)
Green v Campbell, 35 W Va 698, 14 SE 212 (1891)
Enders v Enders, 164 Pa 266, 30 A 129 (1894)
Stringfellow v Somerville, 95 Va 701, 29 SE 685 (1898)
McKercher v Green, 13 Colo App 270, 58 P 406 (1899)
These cases illustrate a well-established policy of the judiciary to manage conflicted family relations based on the best interest of the child. There is no mention of fundamental or constitutional rights in any of these cases, or any doubt expressed by the courts that they had the authority to make these decisions.[40] This position was not limited to state courts. *118 Supreme Court Justice Joseph Story, riding circuit, in United States v Green (3 Mason 482 [1824]) held as follows:
“As to the question of the right of the father to have custody of his infant child, in a general sense it is true. But this is not on account of any absolute right of the father, but for the benefit of the infant; the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education. When, therefore, a court is asked to lend its aid to put the infant into the custody of the father and to withdraw him from other persons, it will look into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant * * * It is an entire mistake to suppose the court is, at all events, bound to deliver over the infant to its father, or that the latter has an absolute vested right in the custody.” (McKercher, 13 Colo App at 282, 58 P at 410, quoting Green.)[41]
Accompanying the judiciary’s foray into the management of parent and child family relationships has been the legislature’s. There are any number of laws that restrict the activities of juveniles. Most, if not all, of those laws were passed without any mention that they restrict the child’s parent’s right to permit the child to engage in certain activities or engage in them in a fashion that the parent feels is appropriate. Looked at from this “parent restricting” point of view, we have the following laws which illustrate that point:
1. A parent may not let his child purchase, or consume alcohol outside a home setting, until the child is 21. (Alcoholic Beverage Control Law § 65-b.)
2. A parent may not allow his child to drive a car until age 16. (Vehicle and Traffic Law art 19.)
3. A parent may not permit his child to be a passenger in his car unless seat belted or, if less than four, in a car seat. (Vehi *119 ele and Traffic Law § 1229-c.)
4. A parent may not permit his child to ride a bike or a scooter without a helmet. (Vehicle and Traffic Law § 1238; 2001 Albany County Law No. C.)
5. A parent must submit his or her child to a series of vaccinations. (Public Health Law § 2164.)
6. A parent may not permit his child less than 16 to possess a BB gun, handgun, shotgun or rifle. (Penal Law § 265.05.)
7. A parent may not permit his child to purchase cigarettes. (Public Health Law § 1399-cc [3].)
8. A parent may not permit his child less than 16 to be employed in most occupations. (Labor Law § 139 et seq.)
9. A parent may not permit a child to marry if the child is less than 14 or, if less than 16, without the permission of a judge. (Domestic Relations Law §§ 15, 15-a.)
10. A parent may not permit his child less than 16 to enter a bar without adult supervision. (Penal Law § 260.21 [1].)
11. A parent may not permit his child to get a tattoo. (Penal Law § 260.21 [2].)
12. A parent may not permit a child less than 18 to hunt bear or deer or less than 16 to hunt other wildlife with a firearm. (ECL 11-0703 [4] [b].)
13. A parent may not permit his child to appear in a professional wrestling or boxing match if less than 18 and, if less than 16, the child may not attend such a performance. (McKinney’s Uncons Laws of NY § 8921 [L 1920, ch 912, § 21].)
14. A parent may not permit his child less than 10 to operate a snowmobile off the parent’s land. (Parks, Recreation and Historic Preservation Law § 25.19.)
15. A parent must send his child to a full-time school from age six to 16. (Education Law art 65.)
Almost all parents would probably support almost all of the above laws or consider them to be minor intrusions into their parental rights. Except for some religious opposition to mandatary vaccinations (see Jacobson v Massachusetts, 197 US 11), most of these parent restricting, child regulatory laws have been uncontroversial. However, this was not the case with the greatest legal intrusion into fundamental parental rights — mandatory schooling. Today, mandatory schooling is universally accepted. This was not always so. Although most *120 states had compulsory education laws by the late 1800’s, compliance was honored more in the breach.[42]
“Amid this changing American scene, public debates began to arise concerning compulsory school attendance laws. There was bitter opposition to the compulsory nature of such laws. Many felt that such legislation deprived parents of their inalienable right to control their children and was an unconstitutional infringement upon the individual liberty guaranteed by the Fourteenth Amendment. Opponents also claimed that compulsory education laws were ‘monarchical’ and that already powerful state governments were arrogating new powers. Claims that the laws were un-American and inimical to the spirit of free democratic institutions were made.”[43]
In commenting upon New York’s compulsory education law in 1918 the Appellate Division, Third Department, had this to say:
“The State is sovereign in the matter of the attendance of a child at school. The dominion of the State is absolute as far as attendance upon instruction is concerned during the ages prescribed in section 621 of the Education Law.” (De Lease v Nolan, 185 App Div 82, 84.)
The Appellate Division’s use of such words as “absolute” and “dominion” shows that any consideration of parental rights, fundamental or otherwise, was far from their minds. All of the regulations of children listed above were based on the police power of the state exercised in the state’s capacity as parens patriae (parent of the country). The laws needed to have only a rational basis to sustain constitutional muster.[44] If the state *121 can direct a parent to send his or her child to all day school for 180 days each year, how less an intrusion into parental rights is it to permit a court to order the parent to provide visitation to a de facto parent for, say, two days each month? When balanced with the child’s constitutional right, this is a fairly modest incursion into the parent’s constitutional right to direct the upbringing of his or her child.
There is also a significant body of statutory law that permits a Family Court to invade the fundamental right of a parent to the control of his or her child. Family Court Act § 320.5 (3) (a) and (b) permit the court to remand a child alleged to be a juvenile delinquent to a secure detention facility upon a finding that “there is a substantial probability that he will not appear in court on the return date * * * or there is a serious risk that he may before the return date commit an act which if committed by an adult would constitute a crime.” There is no mention in the statute of any heightened burden of proof or that the court must take into consideration the parent’s right not to have his or her child removed from his or her care. Identical statutory language applies to the predispositional stages of person in need of supervision (PINS) cases (Family Ct Act § 739 [a]). Upon disposition of juvenile delinquency and PINS proceedings, the court may place the juvenile in state custody in a juvenile facility for an initial period of one year and thereafter from year to year, upon review by the court;, until the child is 18 (Family Ct Act § 353.3 [5]; § 756 [b]). Again, that statute does not make any reference to the parent’s fundamental rights to raise his or her child.
These statutes clearly illustrate the accepted authority of the state to intrude into a parent’s custodial rights to his or her child when the child’s best interests are at stake. An even more obvious example would be the several provisions of Family Court Act article 10, which provide for the removal of children from neglectful or abusive parents. For this entire statutory framework, there is no indication from the laws’ words or context that any “special weight” must be given to a parent’s wishes, as that point was made in Troxel.
*122 Conclusion
 The historical development of family law in America, and the expansion of individual constitutional rights by the Supreme Court of the United States and the Court of Appeals of the State of New York, give foundation to a holding that a child has a constitutional right to maintain contact with a person with whom the child has developed a parent-like relationship. Accompanying that right is also a right to the equal protection of the laws. This requires that the child have the due process necessary to claim his right. This claim can be given constitutional protection, while at the same time giving due recognition, respect and protection to a parent’s constitutional right to the custody, care and control of his or her child. Accordingly, with this goal in mind, the Court holds the following:[45]
1. That a child has certain enumerated and unenumerated constitutionally protected rights.
2. That these rights are protected coextensively by the cited provisions of the Constitution of the United States and the Constitution of the State of New York.
3. That the child’s unenumerated rights include a fundamental right to maintain contact with a person with whom the child has developed a parent-like relationship.
4. That the child also has an enumerated First Amendment freedom of association right under the State and Federal Constitutions to maintain personal relations with a nonbiologically related person.
5. That the child’s rights listed above are liberty interests protected by the Due Process Clauses of the Federal and State Constitutions.
6. That the child is entitled to the equal protection of the laws to be similarly situated with other children who have a statutory procedure to enforce their constitutionally or statutorily protected association rights.
*123 7. That a child having such a right must be provided a process to enforce that right against unwarranted restrictions by the state or a third person, in this case a parent.
8. That a parent has a fundamental right to direct the care, custody and guardianship of his or her child and is presumed to act in the child’s best interest. (Parham v J. R., 442 US 584 [1979].)
9. That this fundamental right of the parent must be balanced with the fundamental rights of the child. That a proper balance can be made by using the following procedure.
9.1. A child or person acting in the child’s behalf seeking to establish or maintain contact with a person who is not one of the child’s parents or siblings must allege facts which, if proven, would establish that the child has developed a parent-like relationship with another person and that his or her custodial parent has refused contact or arbitrarily restricted established contact.
9.2. That the court will first conduct a standing hearing to determine if the child does have a parent-like relationship with the person with whom contact is desired.
9.3. That upon a finding of standing, the court will conduct a hearing to determine if continued contact is in the child’s best interest and to what extent such contact is appropriate.
9.4. That in determining what is in the child’s best interest, the court will take into account all of the circumstances usually considered when making such determinations and also consider the following.
9.4.1. How the relationship was formed and whether the parent objected or consented to any aspect of the relationship’s formation and continuation.
9.4.2. The length, nature and quality of the relationship.
9.4.3. Whether any court-ordered contact would significantly interfere with the parent-child relationship or with the parent’s rightful authority over the child.
9.5. That it will be presumed that the parent’s decision to restrict or terminate contact is in the child’s best interest.
9.6. That the child or other person seeking access will carry the burden of proving all relevant issues by a preponderance of the evidence.
9.7. That the court must give significant weight to the parent’s determination as to what is in the child’s best interest including the decision to allow a certain level of contact.
*124 Based on this decision, the Court will conduct a standing hearing in this case.

. At the outset, the Court notes that the terms “custody” and “visitation” have outlived their usefulness. Indeed, their use tends to place any discussion and allocation of family rights into an oppositional framework. “Fighting for custody” directs the process towards determining winners and losers. The children, always in the middle, usually turn out to be losers. Churchill once said that we shape our buildings and afterwards our buildings shape us. The same can be said for our words. This Court has abandoned the use of the word “visitation” in its orders, using the phrase “parenting time” instead. If the word “custody” did not so permeate our statutes and was not so ingrained into our psyches, that would be the next phrase to go. If our Domestic Relations Law, in both substance and process, was moré child focused, as I believe this decision is, there would be a better framework for determining family rights. Instead, we focus on parental rights. This misplaced focus draws parents into contention and conflict, drawing the worst from them at a time when their children need their parents’ best. The Court notes, for example, that the Family Court Act of Australia uses neither the word custody nor visitation, but refers only to “parenting orders” which can include “residence orders” and “contact orders.” (Australian Family Law Reform Act of 1995 § 64B.)

. The Court has given prior notice of this constitutional issue to the State Attorney General pursuant to CPLR 1012 (b).

. The Supreme Court has ruled that the First Amendment provision guaranteeing the freedom of speech and the right to peaceably assemble includes a freedom of individuals to associate in intimate, personal relationships. (See Griswold v Connecticut, 381 US 479 [1965]; National Assn. for Advancement of Colored People v Alabama ex rel. Patterson, 357 US 449 [1958].) The First Amendment association rights have been found to be protected from intrusion by the state by virtue of the Due Process Clause of the Fourteenth Amendment. (See De Jong v Oregon, 299 US 353 [1937].)

. Article I, § 8 of the New York State Constitution states: “Every citizen may freely speak, write and publish his sentiments on all subjects * * * and no law shall be passed to restrain or abridge the liberty of speech.” Article I, § 9 (1) states: “No law shall be passed abridging the rights of the people peaceably to assemble.” (See Fargnoli v Faber, 105 AD2d 523 [1984].)

. Amendment XIV, § 1 of the United States Constitution reads, in relevant part, “no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.” Article I, § 11 of the New York State Constitution states: “No person shall be denied the equal protection of the laws of this state or any subdivision thereof.”

. This is a procedural anomaly used in many Family Courts. The correct procedure would be for the father to file a termination of placement petition pursuant to Family Court Act § 1062 as opposed to a custody petition. It would make little difference, either way, as long as the court applies the correct best interest test. It is not a pure best interest test like this between two parents, as set forth in Friederwitzer v Friederwitzer (55 NY2d 89, 94). Rather it is a balancing test of whether it is in the child’s best interest to be returned to the father as opposed to continued placement in foster care. It is not a contest between the father and the foster mother as to who is the better parent (see Matter of Michael B., 80 NY2d 299).

. See, for example, on the restraint side: Antonin Scalia, A Matter of Interpretation, Federal Courts and the Law (Princeton Univ 1997); Raoul Berger, Government by Judiciary (Liberty Fund, Law ed 1997); and Richard A. Posner, The Problems of Jurisprudence (Harv Univ Press 1990). On the expansionist side see: Charles L. Black, Jr., A New Birth of Freedom (Grosset/ Putnam 1997); Laurence H. Tribe, Constitutional Choices (Harv Univ Press 1985); and William Lusser, The Limits of Judicial Power, The Supreme Court in American Politics (Univ of NC Press 1988). With a foot in both camps see: John Hart Ely, Democracy and Distrust, A Theory of Judicial Review (Harv Univ Press 1980); Cass R. Sunstein, The Partial Constitution (Harv Univ Press 1993); and Alexander M. Bickel, The Supreme Court and The Idea of Progress (Harper and Row 1970). Antonin Scalia is a Justice of the United States Supreme Court; Raoul Berger retired as the Charles Warren Senior Fellow in American Legal History at Harvard Law School; Richard A. JPosner is a judge of the United States Court of Appeals for the Seventh Circuit and senior lecturer at the University of Chicago Law School; Charles L. Black, Jr., was Sterling Professor Emeritus at Yale Law School; Laurence H. Tribe is the Tyler Professor of Constitutional Law at Harvard Law School; William Lusser is Professor of Political Science at Clemson University; John Hart Ely is the Robert E. Paradise Professor of Law at Stanford Law School; Cass R. Sunstein is the Karl N. Llewellyn Distinguished Service Professor of Jurisprudence at the University of Chicago; and Alexander M. Bickel was the Chancellor Kent Professor of Law and Legal History at Yale University.

. See, for example, the unusual ideological crossover of judges in the recent Supreme Court case holding that a search warrant must be obtained before police may use thermal detectors. Justices Scalia, Souter, Thomas, Ginsburg and Breyer were in majority. Chief Justice Rehnquist and Justices Stevens, O’Connor and Kennedy were in the minority. (Kyllo v United States, 533 US 27.)

. “Man being bom, as has been proved, with a Title to Perfect Freedom and an uncontrolled enjoyment of all the Rights and Privileges of the Law of Nature, equally with any other Man or Number of Men in the World, hath by Nature a power * * * to preserve his Property, that is, his Life, Liberty and Estate against the injuries and Attempts of other Men.” (John Locke, Second Treatise of Government, ch VII, § 87 [Black Swan Books 1698].)

. Professor Pauline Maier of M.I.T. notes that the phrase “pursuit of happiness” appeared frequently in American and English political writings of the time. “The inherent right to pursue happiness probably also included the means of acquiring and pursuing property, but not the ownership of specific things since property can be sold and is therefore alienable.” (American Scripture, Making the Declaration of Independence at 134 [Alfred Knopf 1997].)

. See Griswold v Connecticut, 381 US 479 (1965).

. The Federalist Papers, written by Hamilton, Madison and Jay, have become a primary source for lawyers and judges in their efforts to understand our "Constitution. However, it is not clear that Hamilton really believed what *94 he was saying in Federalist No. 84. It is worth remembering that, at their inception, the Federalist Papers were op-ed pieces that appeared in New York newspapers under the byline Publius. They were meant to carry the Federalist argument in support of the ratification of the Constitution and to persuade New Yorkers, where ratification was in serious doubt. Federalist No. 84 was meant to explain away the glaring defect, in most people’s view, of the absence of a bill of rights. It has only been with time that the Federalist Papers have achieved their status as, perhaps, the greatest political commentary ever produced in America. In July 1788, New York, by a 30-27 vote, became the eleventh state to ratify the Constitution.

. (West Virginia State Bd. of Educ. v Barnette, 319 US 624, 649 [1943] [Frankfurter, J., dissenting]). Barnette held that a school child could not be compelled to recite the pledge of allegiance.

. Today, probably not much issue would be taken with characterizing the freedom of religion as fundamental. In 1787, this was not the case. The Constitutional Convention, by unanimous vote, approved a prohibition on religious tests to hold office. “In so doing, the Convention demonstrated a rare liberality of spirit because all the framers but those who represented New York and Virginia came from States that had Constitutions discriminating against some religious denomination by imposing as a qualification for public office some religious test.” (Leonard W. Levy, Essays on the Making of the Constitution [Oxford Univ Press, 2d ed 1959].)

. If a time line was made of what people generally consider to be their constitutional rights, it would probably amaze them how late arriving most of these rights are. Gideon v Wainwright (372 US 335 [1963]) established the right of poor people to have a court-appointed lawyer in felony cases. Griswold v Connecticut (381 US 479 [1965]) established a constitutional right to privacy within marriage. Conversely, some things that most people would probably consider as a constitutional (or fundamental) right are not so at all. For example, the right of a child to an education is not constitutionally protected. (San Antonio Ind. School Dist. v Rodriguez, 411 US 1 [1973].) One reason for this slow evolution of personal rights is that liberty rights follow property rights. Until a person’s right to own and control property became protected by the Constitution, the rights to free speech, religion, and to assemble, were little more than lofty ideas. The Alien and Sedition Acts are a good example of how fragile and unprotected the rights of free speech and assembly were in 1798. “[Mjost of us would readily concede that the framers of the 1787 Constitution adopted a federal system of government organization in order to, among other goals, help secure the institution of private property.” (Laurence H. Tribe, Constitutional Choices at 11 [Harvard Univ Press 1985].) For a fuller discussion in this area see James Willard Hurst, Law and the Conditions of Freedom in the Nineteenth Century United States (Univ of Wis Press 1956).

. This case does not involve a state intrusion into a constitutional right but rather an exclusion of a constitutional right. It is a maxim of law that for every right there must be a remedy. For example, it is beyond dispute that each person has a fundamental right not to be assaulted. Accordingly, it is incumbent upon the state to criminalize such behavior and provide a process for a person to file a complaint to initiate the prosecution for such a physical trespass.

. The Court’s use of the word Constitution in this decision includes both the New York State and Federal Constitutions. The Court finds that each Constitution’s protective reach covers the right determined in this decision and should be interpreted identically.

. There was little rights determination done in the first 70 or so years of the Supreme Court, up until the Dred Scott decision in 1856 (Dred Scott v Sandford, 19 How [60 US] 393 [1856]). As noted above, the Court was busy developing a constitutional law of property rights. Advancing the proposition that society must first protect property as a foundation for protecting individual liberty see, for example, the following early nineteenth century Supreme Court cases: Fletcher v Peck (6 Cranch [10 US] 87 [1810]); Martin v Hunter’s Lessee (1 Wheat [14 US] 304 [1816]); McCulloch v Maryland (4 Wheat [17 US] 316 [1819]); Trustees of Dartmouth Coll. v Woodward (4 Wheat [17 US] 518 [1819]); Gibbons v Ogden (9 Wheat [22 US] 1 [1824]); and Proprietors of Charles Riv. Bridge v Proprietors of Warren Bridge (11 Pet [36 US] 420 [1837]).

. The science of statutory interpretation is in no better state. “The hard truth of the matter is that American Courts have no intelligible, generally accepted, and consistently applied theory of statutory interpretation.” (Henry M. Hart, Jr., and Albert M. Sachs, The Legal Process at 1169 [Harper Books 1994].)

. Professor Gordon S. Wood notes that “The sharp distinction we recognize between legislation and adjudication is a modem one. All the legislatures in the English-speaking world began as courts making judgments. Parliament had originally been called the High Court of Parliament and the Massachusetts legislature is still called the ‘General Court’.” (Wood, A Matter of Interpretation at 60, n 7.) Colonial judges, on the other hand, had extensive administrative functions. The executive and legislative branches also exercised various judicial functions. For example, the City of Albany had a Mayor’s Court up until the 1940’s and members of the New York State Senate sat on New York’s highest appellate court until 1847. The executive branch also exercises considerable legislative authority through its administrative rule-making powers.

. Thomas Bonham was jailed and fined for practicing medicine without a license. The licensing and enforcing authority was the Royal College of Physicians. The statute allowed the college to keep a portion of the fines. *99 “Such self-dealing violated the common-law maxim that ‘no man [may] be a judge in his own case.’ ” (Alfred H. Knight, The Life of the Law at 71 [Oxford Univ Press 1996].)

. One often hears conservative politicians state that persons appointed to be judges should be “strict constructionists.” A strict constructionist is, apparently, one who stays close to the “original intent” of a law as shown by the “legislative history” and the “framers’ intent.” Most would characterize Supreme Court Justice Antonin Scalia as being in this group. Justice Scalia, however, rejects this label. “I am not a strict constructionist, and no one ought to be * * * A text should not be construed strictly and it should not be construed leniently. It should be construed reasonably, to contain all that it fairly means.” (A Matter of Interpretation at 23.) Most would be surprised to learn that Justice Scalia objects to the use of legislative history (primarily because it is invariably confusing or contradictory) and legislative intent as the proper tools with which to interpret law. “What I look for in the Constitution is precisely what I look for in a statute, the original meaning of the text, not what the original draftsman intended.” (Scalia, A Matter of Interpretation at 38.)

. (See Don E. Fehrenbacher, William Robertson Coe Professor of History and American Studies, Stanford Univ, Slavery, Law and Politics: The Dred Scott Case in Historical Perspective.) Actually, the New York State Court of Appeals articulated a substantive due process theory in 1856, in People v Wynhamer (12 How Prac 238).

. The restraint side often derides the expansionist side for using traditions to discover new rights. However, they have no such problem discovering and using tradition when denying the existence of a claimed right. (See Bowers v Hardwick, 478 US 186 [1986].) In Bowers, the Court held a Georgia law to be constitutional that criminalized certain consensual adult sexual activity within the confines of a person’s home. It would be hard to predict how Bowers, another in the multitude of 5-4 rights decisions, would be *103 decided today. (See, e.g., the recent thermal imaging search case, Kyllo v United States, 533 US 27, 121 S Ct 2038 [June 11, 2001].) “In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.” (Kyllo, 533 US at 37, 121 S Ct at 2045 [Scalia, JJ.)

. “The Migration or Importation of such Person as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight.” (US Const, art I, § 9 [1].) “No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.” (US Const, art IV, § 2, repealed by 13th Amend, Dec. 6, 1865.)

. It seems clear that denying the vote to women did not violate any fundamental sense of fairness or justice of the community when the Fourteenth Amendment was passed in 1868. Women had to wait until 1920 to get the franchise with the passage of the Nineteenth Amendment. This was a 72-year struggle, measured from the 1848 Convention in Seneca Falls, New York. However, the territory of Wyoming enfranchised women in 1869. The New Jersey revolutionary-era Constitution also permitted women to vote, but that right was later taken away, in the early 1800’s. (See Alexander Keyssar, The Right to Vote, the Contested History of Democracy in the United States [Basic Books 2000].)

. Our Court of Appeals had little trouble validating the constitutionality of separate schools for the “colored races.” (People ex rel. King v Gallagher, 93 NY 438 [1883].)

. There always existed an intense, sometimes violent, antislavery movement with such luminaries as Nat Turner, William Lloyd Garrison, Frederick Douglas, Harriet Beecher Stowe and John Brown, to name a few. However, it was clearly a minority movement, bucking the “traditions” of contemporary society. The focus of the debate within “mainstream” America, leading up to the Civil War, was over the extension of slavery. (See Stephen B. Oates, The Approaching Fury [Harper Perennial 1997].)

. One should pause to speculate which of today’s Supreme Court decisions will, 100 years from now, be seen as wrong as we now see Plessy to be, 100 years after it was rendered.

. For a general discussion of this topic see Lawrence D. Houlgate, Three Concepts of Children’s Constitutional Rights: Reflections on the Enjoyment Theory, 2 U Pa J Const L 77 (Dec. 1999); Melinda A. Roberts, Parent and Child in Conflict: Between Liberty and Responsibility, 10 Notre Dame JL Ethics & Pub Poly 485 (1996); Justine Within, A Time For Change: Reevaluating the Constitutional Status of Minors, 47 Fla L Rev 113 (Jan. 1995); Gilbert A. Holmes, The Tie that Binds: The Constitutional Right of Children to Maintain Relationships With Parent-Like Individuals, 53 Md L Rev 358 (Winter 1994); Barbara Jones, Do Siblings Possess Constitutional Rights?, 78 Cornell L Rev 1187 (Sept. 1993).

. Similar to this is Lehr v Robertson (463 US 248 [1983]) where a genetic-father’s attempt to block an adoption by the unwed mother’s new husband was denied.

. The dissent is actually worse on this point, never discussing the child’s constitutional claims at all.

. Gerald D. is yet another 5-4 Supreme Court decision in which it is virtually impossible to discern a clear rule of law. The judicial trench warfare is conducted in the footnotes, where much effort is expended by each side pointing out how “startlingly” mistaken the other side is about virtually everything.

. It surely would have put a bee in the Court’s interpretive bonnet if this family unit was created by an overseas same sex adoption (as allowed in New York, Matter of Jacob, 86 NY2d 651) and the child had two mothers or two fathers.

. To the extent that this Court’s decision could result in visitation being granted between Alex Ryan, Jr., and his former foster mother, it is conceded that that result would probably be opposite if the case were analyzed under the rule of Troxel and surely opposite if analyzed under Alison D.

. The Washington Supreme Court invalidated the statute because it was unconstitutional on its face. The Supreme Court has now told the Washington Supreme Court that the unconstitutionality arises only from “as applied” defects. Justice Souter, in the majority, weighs in on the facial invalidity side, so the “as applied” theory garnered only four of nine votes. Justice Rehnquist’s admonition in dissent in Santosky v Kramer (455 US 745, 770-771 [1982]) is trenchant at this point.
“If ever there were an area in which federal courts should heed the admonition of Justice Holmes that ‘a page of history is worth a volume of logic,’ it is in the area of domestic relations. This area has been left to the States from time immemorial, and not without good reason * * *
“Throughout this experience the Court has scrupulously refrained from interfering with state answers to domestic relations questions. Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family-property arrangements.” (Citations omitted.)

. Justice Thomas, concurring, notes that the plurality opinion fails to set forth the appropriate standard of review. He would apply strict scrutiny and require the state to articulate a compelling interest to justify intrusion into a fundamental right. On the other hand, we just noted that in Nguyen (above), the biological father’s constitutional rights were to be measured, according to Justice Scalia, by the rational basis test.

. Justice Scalia, in dissent, states (at 92): “I do not believe that the power which the Constitution confers upon me as a judge entitles me to deny legal effect to laws that (in my view) infringe upon what is (in my view) that unenumerated right.” Justice Scalia, in effect, is saying that only enumerated rights have constitutional protection. This is a distinctly minority position. However, if it is an enumerated right, it is a different matter. “I note that the [mother] * * * is not asserting, on behalf of her children, their First Amendment rights of association or free exercise. I therefore do not have occasion to consider whether, and under what circumstances, the parent could assert the latter enumerated rights.” (Troxel at 93, n 2.) Justice Scalia is apparently saying that only a parent and perhaps not a law guardian for the child can raise the child’s constitutional rights. However, what would a court do if a grandparent petitioned for visitation and one parent favored it and one parent opposed it. Could one of those parents raise the child’s First Amendment association rights to be used against the other parent?

. It would seem that Alison D. could have come out the other way if the principle of equitable estoppel was applied. The fact pattern is nearly identical to that in Judge Cooney’s thoughtful opinion in Matter of J. C. v. C. T. *116 (184 Misc 2d 935) which permitted nonparent visitation on an estoppel theory. Very similar is Jean Maby H. v Joseph H. (246 AD2d 282) where the Court applied the estoppel theory to prevent a mother from cutting off visitation of the child by the child’s non-genetic-father. The Court here has not relied on the estoppel theory because one of its elements, the consent of the biological parent to the formation of the child-non-parent relationship, is missing. Even so, from a child’s best interest focused point of view, this consideration would drop down on the importance scale. See also Mancinelli v Mancinelli (203 AD2d 634) where, despite an HLA test establishing nonpaternity, the Court held that the husband was estopped from denying this two-year-long “de facto” fatherhood of his child in an attempt to escape his child support obligation.

. It is not being suggested that the nineteenth century courts had a tin ear for constitutional principles. It should be remembered that the emotional valuing of children is a fairly recent development. For much of history children were treated by the legal system as a little more than a variation on the law of chattel (see generally, May Beth Norton, Founding Mothers and Fathers, Gendered Power and the Forming of American Society [Vintage Books 1996]; Viviana A. Zelizer, Pricing the Priceless Child, the Changing Social Value of Children [Basic Books 1985]).

. For a general discussion of how the legislatures in America passed much responsibility for the determination and development of family law to the judiciary see Michael Grossberg, Governing the Hearth, Law and the Family in Nineteenth-Century America (Univ of NC Press 1985). “By 1867, thirty-three of thirty-seven American jurisdictions had substituted judicial for legislative divorce. These grants of domestic authority to the bench included a large discretionary power to award custody. Though judges constantly reaffirmed their allegiance to paternal supremacy, they used assertions of equity and children’s welfare to equalize custody rights.” (Gross-berg at 251.)

. M.S. Katz, A History of Compulsory Education Laws (Phi Delta Kappa Educational Found 1976).

. Lawrence Kotin and William F. Ochman, Legal Foundations of Compulsory School Attendance (Kennikat Press 1980).

. The rights determination business got a new lease on life after the decline in popularity and acceptance of substantive due process as a constitutional rights search engine. In its place, the Equal Protection Clause gained prominence with the development of the concept of heightened scrutiny to evaluate governmental restrictions of fundamental rights. This eventually developed into a three-tiered inquiry. General regulatory legislation need only have a rationally related basis to the desired ends. Restrictions in areas such as gender would have to be substantially related to meet an important governmental interest (intermediate scrutiny). Restrictions of *121 fundamental rights must be justified by a compelling state interest and be narrowly tailored to meet the law’s objectives. This was all foreshadowed in Justice Stone’s famous footnote 4 in United States v Carolene Prods. Co. (304 US 144, 152, n 4 [1938]) where he spoke of legislation being “subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment.”

. The first criticism of a holding such as this is to reduce it to absurdity by saying, for example, that this would mean a child’s babysitter or day care provider could petition for visitation rights. It holds no such thing. Judge Kaye recognized this line of attack in her dissent in Alison D. (at 661), where she said: “Arguments that every dedicated caretaker could sue for visitation if the term ‘parent’ were broadened, or that such action would necessarily effect sweeping change throughout the law, overlook and misportray the Court’s role in defining otherwise undefined statutory terms to effect statutory purposes, and to do so narrowly, for those purposes only.”